# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNILOC USA, INC., et al.,

    Plaintiffs,

v.

APPLE, INC.,

    Defendant.

No. C 18-00358 WHA

**ORDER DISMISSING CASE FOR LACK OF STANDING**

## INTRODUCTION

Having earlier found the asserted patent claims invalid for reciting ineligible subject matter, the Federal Circuit has further directed us to consider plaintiffs' standing. This order holds that plaintiffs' patent licensing scheme divested them of exclusionary rights and, thus, of Article III standing. The defect uncurable, even via joinder, this case is **DISMISSED**.

## STATEMENT

Hewlett Packard assigned several patents to Uniloc Luxembourg on May 16, 2017. Uniloc Luxembourg promptly licensed the patents to Uniloc USA, and the two filed a slew of suits against Apple on May 26 in the Eastern District of Texas. Following transfer and assignment to the undersigned, an order dated May 18, 2018, granted judgment on the pleadings to Apple in the instant case, finding the asserted claims of United States Patent No. 6,661,203 invalid under 35 U.S.C. § 101 (Dkt. No. 99). The Unilocs appealed.

While on appeal, the related cases (Nos. C 18-00360 *et seq.*) proceeded. Therein, Apple discovered information that might undermine the Unilocs' standing to sue. Since 2014, the Unilocs' funding for their patent suits came from Fortress Credit Co LLC, by way of a loan pursuant to a Conformed Revenue Sharing and Note and Warrant Purchase Agreement ("Revenue Sharing Agreement"), a Patent License Agreement, and several later amendments.

Fortress's security interest in the loan took the form of, at least in part, a broad license of the Unilocs' patents upon one specific condition. The Revenue Sharing Agreement granted Fortress a "a non-exclusive, royalty free, license (including the right to grant sublicenses) with respect to the Patents" but on the condition that Fortress "shall only use such license following an Event of Default" (Rev. Sh. Agmt., Dkt. No. 165-5 § 2.8). The Patent License Agreement echoed:

> Subject to the terms and conditions herein and in the Purchase Agreement, Licensor hereby grants to Licensee a non-exclusive, *transferrable, sub-licensable, divisible, irrevocable*, fully paid-up, royalty-free, and worldwide license to the Licensed Patents, including, but not limited to, the rights *to make*, have made, market, use, sell, offer for sale, import, export and distribute the inventions disclosed in the Licensed Patents *and otherwise exploit* the Licensed Patents *in any lawful manner in Licensee's sole and absolute discretion* solely for the benefit of the Secured Parties ("Patent License"), provided that *Licensee shall only use the Patent License following an Event of Default*.

(Pat. Lic., Dkt. No. 165-6 § 2.1) (emphasis added).

Section 7.1.2 of the Revenue Sharing Agreement defined an "Event of Default" as, in relevant part, the "fail[ure] to perform or observe any of the covenants or agreements contained in Article VI," which in turn provided:

> 6.2.2. From the Closing Date through December 31, 2016, the Company [Uniloc] shall have received at least $20,000,000 in Actual Monetization Revenues. As of March 31, 2017 and the last day of each fiscal quarter thereafter, the *Company shall have received at least $20,000,000 in Actual Monetization Revenues during the four fiscal quarter period ending on such date*.

(Rev. Sh. Agmt. § 6.2.2) (emphasis added).

Apple moved to dismiss the related cases, arguing that the Unilocs had, in fact, defaulted on their monetization requirements and had, thus, released the sole limit on Fortress's broad

2

sublicensable rights in the asserted patents, divesting the Unilocs of standing to sue. An order dated January 17, 2019, found the two Unilocs did possess sufficient rights in the asserted patents to confer standing. Despite the apparent default of the revenue sharing terms, the order found that the Unilocs had cured their default to Fortress's reasonable satisfaction, as somewhat evidenced by their later May 15 amendment. On reconsideration, a subsequent order declined to disturb this finding, but noted that Apple might be permitted to challenge the Unilocs' standing at trial and authorized discovery on the matter in the interim. It appears, however, that discovery was either limited or never took place, as the cases were stayed pending *inter partes* review (Case No. C 18-00360, Dkt. Nos. 131, 157, 204).

All of that happened in the related cases. This case had gone on appeal to the Federal Circuit when Uniloc challenged the holding that its asserted claims were invalid. On appeal, Apple alerted the Federal Circuit to the standing issue progressing in the related cases, so the panel remanded for discovery and resolution of the question of standing "in the first instance." *Uniloc USA v. Apple Inc.*, 784 Fed. App'x 763, 768 (Fed. Cir. 2019). So we come back to square one.

On remand, the Unilocs moved for a declaration of jurisdiction and joinder of a new entity, Uniloc 2017. An order dated December 16, 2019, held the motion in abeyance and, following the panel's direction, ordered disclosure of all discovery taken in the related cases. When that proved insufficient, a January 29 order granted written discovery into the question of the Uniloc-Fortress dealings. Disputes remaining, an April 1 order referred the discovery to Magistrate Judge Donna M. Ryu. Following completion of that discovery, the Unilocs again move for a declaration of jurisdiction and for joinder of Uniloc 2017. Apple opposes and moves to dismiss the Unilocs for lack of standing. This order follows full briefing and a hearing (held telephonically due to COVID-19).

## ANALYSIS

1. **PATENT STANDINGS STILL REQUIRES "EXCLUSIONARY RIGHTS."**

Federal jurisdiction rests on "the irreducible constitutional minimum of standing." The invoking party must show a concrete, particularized, and actual or imminent (as opposed to

3

conjectural or hypothetical) injury in fact, fairly traceable to the defendant's conduct, which will be redressed by a favorable decision. Standing must exist at the outset and must persist through a case. Though mere allegations of standing may suffice on the pleadings, in successive stages of litigation, evidence will be required. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). A defect may be raised at any time, and neither waiver, estoppel, nor the parties' consent may overcome it. *See Booth v. United States*, 990 F.2d 617, 620 (Fed. Cir. 1993); *Diggs v. Dep't Hous. & Urb. Dev.*, 670 F.3d 1353, 1355 (Fed. Cir. 2011); *Cf. United States v. Johnson*, 319 U.S. 302, 305 (1943).

In a competing vein, Congress permits a "patentee" to sue for patent infringement. 35 U.S.C. § 281. "The term patentee includes the original patentee (whether the inventor or original assignee) and 'successors in title.'" *Lone Star Silicon Innov'ns LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1229 (Fed. Cir. 2019). But "[a] patent is, in effect, a bundle of rights which may be divided and assigned, or retained in whole or part." *Alfred E. Mann Found. for Scien. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010) (quotation marks omitted). So the identity of the "patentee" really asks who retains "all substantial rights under the patent." *See Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1342 (Fed. Cir. 2014), *vacated on other grounds*, 575 U.S. 959 (2015). This question turns on substance, not terminology. *See Lone Star*, 925 F.3d at 1229.

The Federal Circuit has articulated three categories of potential plaintiffs in patent cases. In the first category fall those who "hold all legal rights to the patent as the patentee or assignee of all patent rights — the entire bundle of sticks." If this patentee "transfers 'all substantial rights' to the patent" to another, the other becomes the patentee. Under the Patent Act, at least, the owner of "all substantial rights" may sue in her own name. *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339–40 (Fed. Cir. 2007).

In the second category come those who "hold exclusionary rights and interests created by the patent statutes, but not all substantial rights to the patent." Such a plaintiff holds rights that might be infringed under the Patent Act, and may sue for infringement — *but only alongside the patentee*, *i.e.*, the entity retaining "all substantial rights." *Morrow*, 499 F.3d at 1340. A

4

patent owner's absence, however, may be remedied via Rule 19 joinder. *See, e.g.*, *Lone Star*, 925 F.3d at 1236.

The third category of plaintiff includes those who "hold less than all substantial rights to the patent and lack exclusionary rights under the patent statutes." *Such a plaintiff may not sue for infringement*. *Morrow*, 499 F.3d at 1340–41. This defect cannot be cured, even by joinder. *See Azure*, 771 F.3d at 1347.

Now, confusion about the interplay between this (and, more broadly, any) framework of statutory right to sue and our doctrine of standing has long persisted. On the one hand, the United States Supreme Court has told us that standing "often turns on the nature and source of the claim asserted" and that, "[e]ssentially, the standing question in such cases is whether the constitutional *or statutory provision* on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (emphasis added). Following this guidance, the Federal Circuit has, at times, articulated this three-part framework under Section 281 using the language of Article III standing. *See, e.g.*, *Morrow*, 499 F.3d at 1339–41; *Azure*, 771 F.3d at 1344. On the other hand, in *Lujan* the Supreme Court told us that a statutory grant of a claim for relief did not satisfy or displace the standing inquiry. *Lujan*, 504 U.S. at 572–74.

More recently, however, the Supreme Court has clarified that whether a plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue" (*i.e.* who "has a cause of action under the statute") asks a question of statutory interpretation *separate* from the question of Article III standing, as "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the court's statutory or constitutional *power* to adjudicate the case." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128, fn. 4 (2014). So, a plaintiff's statutory right to invoke Section 281 and its constitutional standing to sue pose separate inquiries. And, thus, whether a plaintiff "possesses all substantial rights in a patent does not implicate standing or subject-matter jurisdiction." *Lone Star*, 925 F.3d at 1235–36.

5

The Unilocs argue that the Federal Circuit's three categories of patent plaintiff now play no part in the standing inquiry. In essence, they argue that we should start from scratch with the bare injury-in-fact inquiry and dispense with the Federal Circuit's previous construction of the requirement in the patent context, *i.e.* the requirement that a patent plaintiff possess exclusionary rights. This order disagrees. *Lexmark* and *Lone Star* do not require that we throw the baby out with the bathwater. They just require us to separate the inquiries of statutory right to sue and constitutional standing.

*Lone Star* held that "whether a party possesses *all substantial rights* in a patent does not implicate standing or subject-matter jurisdiction." It did not hold that whether a party possesses *any rights* in a patent does not implicate standing. Indeed, the wrong that *Lone Star* sought to correct was, in the Federal Circuit's view, that the district court had dismissed a plaintiff who lacked "all substantial rights" and had sued without the all-substantial-rights holder (*i.e.* "patentee") joined. The panel clarified that the plaintiff's allegation of exclusionary rights satisfied the constitutional inquiry (at least on the pleadings), whereas the plaintiff's lack of "all substantial rights" went instead (and separately) to its *statutory* right to sue (and then to Rule 19 joinder of the patentee). The circumstances did not present the panel with the opportunity to hold that a plaintiff possessing *less than* exclusionary patent rights would nonetheless have constitutional standing to sue. *Lone Star*, 925 F.3d at 1234–38.

Nor could *Lone Star* have so held. Despite the intermingling of statutory and constitutional language in prior decisions, the injury-in-fact inquiry drives our distinction between those with exclusionary rights and those without. "[T]he grant of an exclusive license to make, use, or sell [a] patented invention carries with it the right to prevent others from practicing the invention." *Morrow*, 499 F.3d at 1340. Patent infringement does "injury to [the party's] *exclusive right*." *Indep. Wireless Tel. Co. v. Radio Corp. Am.*, 269 U.S. 459, 469 (1926). That is, the *injury* — the concrete and particularized invasion of a legally recognized interest — requires a right to exclude others from practice of a claimed art. *Lujan*, 504 U.S. at 560. Without that right, there is no invasion, and a party "is not injured by that alleged infringer." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1266 (Fed. Cir. 2010).

6

### 2. DEFAULT GAVE FORTRESS BROAD PATENT RIGHTS.

Our facts are uncontested. On March 31, 2017, the Unilocs had only gathered $14 million in revenue over the previous year. Fortress did not believe the Unilocs to be in default. And, discovery now reveals, *the Unilocs took no action to remedy any default and no one even discussed what steps the parties might take to cure a default*. The parties contest, however, what this all means under the agreements. It means, this order holds, that the Unilocs *did* default, *never* cured, and when they sued here, Fortress enjoyed a wide right to license the '203 patent *which divested the Unilocs of standing to sue*.

The Unilocs argue deference to the previous findings in the related cases. But this would flout the Federal Circuit's direction to take discovery and resolve the matter "in the first instance." Following this direction, and with a fresh and better record, this order considers the standing question anew. 784 Fed. App'x at 768.

Here are the details. The Unilocs defaulted. Under New York law, which governs the agreements here, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *MHR Capital Partners LP v Presstek*, 12 N.Y.3d 640, 645, 912 N.E.2d 43 (2009). The Unilocs missed their monetization mark by six million dollars, breached that term under Article VI of the Revenue Sharing Agreement, and triggered an Event of Default under Article VII.

The Unilocs failed to cure that Event of Default. We again turn to the plain language of the agreement. "Once an Event of Default has occurred, such Event of Default shall be deemed to exist and be continuing for all purposes of this Agreement." The agreement provided three mechanisms to annul such a default:

> (1) Majority Purchasers shall have waived such Event of Default in writing;
>
> (2) [T]he Company shall have cured such Event of Default to the Majority Purchasers' reasonable satisfaction or the Company or such Event of Default otherwise ceases to exist; or
>
> (3) [T]he Collateral Agent and the Purchasers or Majority Purchasers (as required by Section 9.4.1) have entered into an amendment to this Agreement which by its express terms cures such Event of Default, at which time such Event of Default shall no longer be deemed to exist or to have continued.

7

(Rev. Sh. Agmt. § 7.3).

The first form of annulment falls away as the Unilocs offer no writing from Fortress waiving the default. And, the latter half of the second form offers no relief here. The Unilocs bear the burden of establishing standing, and they do not contend that they gathered six million more dollars by May 26, such that the default might cease to exist.

Nor does the third form offer aid. The Unilocs and Fortress did, in fact, amend their agreements on May 15, 2017, eleven days before filing this suit. But remedy via amendment requires the new agreement to "by its express terms cure[] such Event of Default." Our May 15 amendment says nothing of the sort. On the contrary, it states that "[t]he execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Collateral Agent or any Purchaser under the Agreement or any Document, nor constitute a waiver of any provision of the Agreement or any Document" (Dkt. No. 165-7). So, unless we disregard the express terms of *both the original agreement and the amendment*, which we cannot do under New York law, the May 15 amendment effected no cure of the Unilocs' default.

So the Unilocs must rely on the second form, their "cure[] [of] such Event of Default to the Majority Purchasers' [Fortress's] reasonable satisfaction." *But recall, the Unilocs now admit that they took no action to cure and, in fact, never discussed cure with Fortress at all*. Nevertheless, they contend that Fortress was reasonably satisfied, as evidenced by both Fortress's representatives' testimony that they did not believe an Event of Default to exist and by Fortress and the Unilocs' May 15 amendment.

Which begs the question: reasonably satisfied with what? The agreement requires a (i) "cure[]" to (ii) Fortress's "reasonable satisfaction." The Unilocs admit they didn't do anything. Again, "under New York law, 'words and phrases . . . should be given their plain meaning,' and the contract 'should be construed so as to give full meaning and effect to all of its provisions.'" *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005). Cure connotes action. *See, e.g.*, *In re Taddeo*, 685 F.2d 24, 26–27 (2d Cir. 1982). The Revenue Sharing Agreement used both "cure" and "waiver," and so means

8

different things by them, as evidenced by use the phrase "cure, *or* waiver" (Rev. Sh. Agmt. At ¶ 7.1.4). If, after default, Fortress can be reasonably satisfied with the Unilocs' total *inaction* to remedy the default, that is a *waiver*. But such waiver of default must have been in writing. Permitting the "reasonable satisfaction" clause to annul a default without a writing and where no steps have been taken to cure it renders the waiver clause meaningless, a result we must avoid. *See Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 599, 176 N.E.2d 37, 38 (1961); *see also Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1231 (Fed. Cir. 1997).

Regardless, Fortress cannot simply say that it did not believe an Event of Default to exist. Given the uncontested fact that the Unilocs breached their monetization requirement, that assertion contradicts and would rewrite the contract, something we do not permit later testimony to do, particularly in the presence of a merger clause excluding parol evidence (Rev. Sh. Agmt. § 9.9). *See Jarecki v. Shung Moo Louie*, 95 N.Y.2d 665, 669, 754 N.E.2d 1006 (2001). There was a way to remove the monetization requirement from the parties' arrangement — amendment; something the parties did not do when they amended their arrangement *while the Event of Default existed*.

When the Unilocs sued on May 26, 2017, the uncured Event of Default satisfied the only precondition to Fortress's *use* of its "transferrable, sub-licensable, divisible, irrevocable" license to make, use, sell, or "otherwise exploit" the '203 patent "in any lawful manner" in Fortress's "sole and absolute discretion."

\*   \*   \*

This order recognizes that it reaches the opposite result as the prior order in the related cases (No. C 18-00360, Dkt. No. 157). There, the undersigned found, regardless of the Unilocs' failure to meet their monetization goal, that a declaration by a Fortress executive and the parties' third amendment to the Revenue Sharing Agreement evidenced Fortress's reasonable satisfaction with the Unilocs' performance. Aside from our new record, and the Federal Circuit's direction to take another look, the prior order lacked some crucial facts which contributed to a correctable error of law.

*First*, the Court lacked the entirety of the third amendment to the Revenue Sharing Agreement. Relying on Fortress's declaration that "there is no dispute Fortress's signature to the May 15 Agreement establishes Uniloc had cured that ostensible 'Event of Default,'" the prior order found: "[t]hat Fortress chose to execute a third amendment . . . indicates that plaintiffs cured the purported default . . . to Fortress's reasonable satisfaction" (No. 18-00360, Dkt. Nos. 141-7 at ¶ 12; 157). Contradicting this finding, Section 4 of the amendment — which the parties *did not* then submit to the Court — stated "[t]he execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Collateral Agent or any Purchaser under the Agreement or any Document, nor constitute a waiver of any provision of the Agreement or any Document" (*compare* Dkt. No. 165-7 *with* No. 18-00360, Dkt. No. 134-9).

*Second*, the prior order broadly construed "cure" to encompass the parties' course of dealing following the Event of Default. This construction was understandable, given Unilocs' and Fortress's conduct following and in response to the default remained shrouded. Now, as noted above, discovery has since revealed that the Unilocs took *no* steps to remedy their default and never even discussed the matter with Fortress. As a result, the prior order (though it did not know it) construed "cure" so broadly as to encompass "waiver," a separate provision in the agreement.

Both factual errors contributed to the broader error of law. Construing the term "cure" to include a waiver of the default rendered redundant the separate requirement that waivers be in writing. And taking the third amendment as evidence of Fortress's reasonable satisfaction rendered redundant the separate requirement that amendments must expressly annul a default. As explained above, this ran afoul of New York's canon of contractual interpretation to avoid constructions that render a contract term meaningless. *Corhill*, 9 N.Y.2d at 599. A federal court should defer to a state's interpretation of state law. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). With the benefit of hindsight, the prior order gave short shrift to New York's interpretation of its

10

1   own law on this and several other of the points discussed above. Having now recognized the
2   error, this order now corrects course.

### 3. THE UNILOCS LACKED "EXCLUSIONARY RIGHTS."

Fortress's broad rights in the '203 patent divested the Unilocs of standing to sue here. As above, a party "derives its standing from the exclusionary rights it holds," and "its standing will ordinarily be coterminous with those rights." For example, "an exclusive licensee lacks standing to sue a party who has the ability to obtain such a license from another party with the right to grant it." *WiAV*, 631 F.3d at 1266. "That same logic applies even if it is the patent owner holding the nonexclusive right and the licensee hold[ing] the exclusionary rights." *Azure*, 771 F.3d at 1344. This bears restating, given the Unilocs' continual self-characterization as the "patent owner," as though Article III standing appears at the utterance of a magic phrase. A patent licensee's right to grant an unencumbered sublicense renders even the *patent owner's* right to exclude (and, thus, to sue) illusory. *Mann*, 604 F.3d at 1362.

Here then, though Uniloc Luxembourg held title to the '203 patent, it had granted *both* Uniloc USA and Fortress licenses which permitted each to sublicense the patent (No. C 18-00360, Dkt. No. 134-16). Aside from agreeing to seek the Unilocs' consent before granting sublicenses that would impose financial burdens on them, Fortress held an unfettered right in its "sole and absolute discretion" to license the '203 patent to the world. Neither Uniloc Luxembourg nor Uniloc USA could have had an expectation that others would not practice the '203 patent and would not have been injured if and when others did so. The Unilocs offer three counterarguments. None compel.

*First*, the Unilocs' protest that under *Alfred E. Mann Foundation for Science v. Cochlear Corporation* there *must always* be a patent owner, here the Unilocs, who has the right to sue and that any other result would be absurd. Not so.

To start, *Mann* held only that there *can* only be one patent owner, holding "all substantial rights." It did not hold that there *must always* be one. Nor was that possibility raised. *Mann* addressed a two-party agreement (as opposed to our tripart web) and asked only whether the patent owner still held enough (read "all substantial") rights to sue alone. And, under *Lone*

11

*Star*, this question of who possesses "all substantial rights" goes to a party's statutory right to sue in its own name, as opposed to our present inquiry of Article III standing and "exclusionary rights." 604 F.3d at 1359–60; *Lone Star*, 925 F.3d at 1235–36; *see also*, *Aspex Eyewear v. Miracle Optics*, 434 F.3d 1336 (Fed. Cir. 2006).

It is perhaps true that where a patent owner has granted multiple others the right to sublicense the patent that no one would have the right to sue a particular defendant for infringement. But such a result is not absurd. This is still America; the free market is our default, and the patent is an aberration. Among our ordinary property rights comes the right to destroy, a right consistent with and applicable to the fleeting property interest of a patent which might be destroyed by failure to pay maintenance fees, voluntary commitment to the public domain, or other means. 35 U.S.C. § 41(b). Regardless, a licensing scheme that divests all interest holders of standing does not destroy a patent. It merely prevents suit until a restructuring of the interests among them. "While parties are free to assign some or all patent rights as they see fit based on their interests and objectives, this does not mean that the chosen method of division will satisfy standing requirements." *Morrow*, 499 F.3d at 1341, fn. 8.

*Second*, the Unilocs argue that Federal Circuit precedent prevents Apple from invoking contracts it was not a party to. In *Uniloc USA v. ADP, LLC*, several defendants moved to dismiss the appeal, arguing that Uniloc had breached an agreement with a third party, giving that third party broad licensing rights, and undermining Uniloc's standing. The Federal Circuit, in a nonprecedential decision, denied the motion, explaining that no one had shown that the third party, "which is not a party to this litigation, considers Uniloc to be in breach or has asserted a right to sublicense and release Movants from liability relating to the patents-at-issue." 772 Fed. App'x 890, 894–95 (Fed. Cir. 2019).

Yet *ADP* distinguishes itself from this case. There, the panel described the third-party interest in the patents as "reversionary," or as the Unilocs describe it, "discretionary." *Ibid.* Fortress's interest here is neither reversionary nor discretionary. It required no "activat[ion]" or invocation. Rather, under the plain language of agreement, the Unilocs *already granted* Fortress the right to use and sublicense the '203 patent on the limitation that Fortress would not

12

United States District Court
Northern District of California

*use* the right until an Event of Default. This distinction isn't merely semantic. The bulk of the Federal Circuit's precedent articulating the bounds of "all substantial rights" to identify the patent owner and "exclusionary rights" to determine standing to sue begins with a defendant, *not a party to the agreement*, challenging the legal implications of the allocation of rights between the parties. *See, e.g.*, *Lone Star*, 925 F.3d at 1227–28; *Mann*, 604 F.3d at 1358; *Morrow*, 499 F.3d at 1334–35; *Aspex*, 434 F.3d at 1338. Were we to take *ADP* the step further of barring a defendant not privy to the agreement from questioning the rights *already allocated* under the agreement, we would have to disregard this body of caselaw as well.

Moreover, as explained above, neither waiver, consent, nor contract can manufacture standing. *See Booth*, 990 F.2d at 620; *Diggs*, 670 F.3d at 1355; *cf. Johnson*, 319 U.S. at 305. And, absent some ambiguity, the contracts here speak for themselves. *MHR*, 12 N.Y.3d at 645. This inquiry turns on the facts and the contract terms, not the parties' subjective beliefs.

*Third*, the Unilocs contend that Fortress's license does not divest them of standing to sue retroactively. They claim that the License Agreement granted Fortress only a *prospective* right to grant sublicenses. Such restrictive language appears in neither the Revenue Sharing Agreement nor the Patent License, and the Unilocs cite no decision for the proposition that we should import the limitation. On the contrary, under New York law, "if parties to a contract omit terms — particularly, terms that are readily found in other, similar contracts — the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Products Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560, 16 N.E.3d 1165, 1172 (2014). Absent such a limitation in the text of the agreement, Fortress's licensing rights operate both prospectively and retrospectively.

## CONCLUSION

Uniloc Luxembourg and Uniloc USA's licensing scheme deprived them of exclusionary rights in the '203 patent. This, in turn, deprived them of Article III standing. Such a defect cannot be cured, even via joinder. *Azure*, 771 F.3d at 1347. Apple's motion is **GRANTED**. The Unilocs' motion to join Uniloc 2017 is **DENIED AS MOOT**. To the extent the Court lacked jurisdiction to rule the asserted patent claims invalid, the May 18, 2018, order granting

13

judgment on the pleadings to Apple (Dkt. No. 99) is **VACATED** with the understanding that if this order is vacated or reversed, the order regarding invalidity shall be reinstated. This case is **DISMISSED**. The Clerk shall please close the file.

**IT IS SO ORDERED.**

Dated: December 4, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

14