# United States Court of Appeals for the Federal Circuit

---

**UNILOC 2017 LLC,**
*Plaintiff-Appellant*

v.

**GOOGLE LLC,**
*Defendant-Appellee*

---

2021-1498, 2021-1500, 2021-1501, 2021-1502, 2021-1503, 2021-1504, 2021-1505, 2021-1506, 2021-1507, 2021-1508, 2021-1509

---

Appeals from the United States District Court for the Northern District of California in Nos. 4:20-cv-04355-YGR, 4:20-cv-05330-YGR, 4:20-cv-05333-YGR, 4:20-cv-05334-YGR, 4:20-cv-05339-YGR, 4:20-cv-05341-YGR, 4:20-cv-05342-YGR, 4:20-cv-05343-YGR, 4:20-cv-05344-YGR, 4:20-cv-05345-YGR, 4:20-cv-05346-YGR, Judge Yvonne Gonzalez Rogers.

---

Decided: November 4, 2022

---

JEFFREY A. LAMKEN, MoloLamken LLP, Washington, DC, argued for plaintiff-appellant. Also represented by KENNETH E. NOTTER, III, LUCAS M. WALKER; JORDAN RICE, Chicago, IL; AARON JACOBS, Prince Lobel Tye LLP, Boston, MA.

   Dan L. Bagatell, Perkins Coie LLP, Hanover, NH, argued for defendant-appellee.  Also represented by Andrew Dufresne, Sopen B. Shah, Madison, WI; Elizabeth Brann, Paul Hastings LLP, San Diego, CA; Robert Unikel, Chicago, IL.

_____

 Before Lourie, Dyk, and Hughes, *Circuit Judges*.

Dyk, *Circuit Judge*.

   Uniloc 2017 LLC ("Uniloc 2017") brought multiple patent infringement suits against Google LLC in the Eastern District of Texas.  Uniloc 2017 alleged that various Google products infringed a variety of patents directed to innovations in multimedia content delivery (Nos. 6,628,712, 6,952,450, 7,012,960, and 8,407,609), IT security (Nos. 8,949,954 and 9,564,952), high-resolution imaging (No. 6,349,154), network connectivity (No. 8,194,632), video conferencing (No. 6,473,114), and image and text searching (Nos. 6,253,201 and 6,366,908).  Those suits were later transferred to the Northern District of California.  Google moved to dismiss the actions, alleging Uniloc 2017 lacked standing, and thus the court lacked subject matter jurisdiction.  Google's theory was that Uniloc 2017 lacked standing because it lacked the right to exclude, its predecessors having granted Fortress Credit Co. LLC a license and an unfettered right to sublicense to the asserted patents as part of a financing arrangement.

   Uniloc 2017 argued that its predecessors had not granted such a license to Fortress and, even if they had, the license would not eliminate Uniloc 2017's standing.  Uniloc 2017 further argued that, in any event, any license had been eliminated by a Termination Agreement executed between Uniloc 2017's predecessors and Fortress before these suits commenced.  The district court granted Google's motion to dismiss, finding that a license had been granted; that the license survived the Termination Agreement; and

that Uniloc 2017 therefore lacked standing. We hold that the district court erred in interpreting the Termination Agreement and in concluding there was no subject matter jurisdiction. We reverse and remand.

## BACKGROUND

In two related appeals,[1] we today determine that Uniloc 2017 is collaterally estopped from arguing both that Uniloc 2017's predecessors had not licensed Fortress and that Fortress's license did not deprive Uniloc 2017 of standing. *Uniloc USA, Inc. v. Motorola Mobility LLC*, -- F. 4th -- (Fed. Cir. 2022). This case presents a different issue: Whether the Termination Agreement terminated Fortress's license, and thereby restored Uniloc 2017's standing to sue, an issue as to which there is no claim of collateral estoppel.

The background of the present controversy is as follows. On December 30, 2014, Uniloc 2017's predecessors, Uniloc Luxembourg ("Uniloc Lux") and Uniloc USA (together, "the Unilocs"), entered into a Revenue Sharing and Note and Warrant Purchase Agreement ("RSA") with Fortress in connection with a loan Fortress made to the Unilocs. The RSA stated:

> [T]he [Unilocs] shall grant to [Fortress], for the benefit of the Secured Parties, a non-exclusive, royalty free, license (including the right to grant sublicenses) with respect to the Patents, which shall be evidenced by, and reflected in, the Patent License Agreement. [Fortress] and the Secured

---

[1] The other appeals are *Uniloc USA, Inc. v. Motorola Mobility LLC*, No. 21-1555, (Fed. Cir. 2022) and *Uniloc 2017 LLC v. Blackboard Inc.*, No. 21-1795 (Fed. Cir. 2022).

Parties agree that [Fortress] shall only use such license following an Event of Default.

J.A. 593, § 2.8.  In other words, Fortress would effectively obtain a license if there was an Event of Default.

There were three enumerated Events of Default, one of which was the failure "to perform or observe any of the covenants or agreements contained in Article VI." J.A. 602 § 7.1.2.  One such covenant was: "As of March 31, 2017 and the last day of each fiscal quarter thereafter, the [Unilocs] shall have received at least $20,000,000 in Actual Monetization Revenues during the four fiscal quarter period ending on such date." J.A. 596 § 6.2.2.

The contingent license referenced in the RSA was formally granted in the Patent License Agreement ("License Agreement") that was executed between the Unilocs and Fortress on December 30, 2014.  The License Agreement stated that the license was "non-exclusive, transferrable, sub-licensable, divisible, irrevocable, fully paid-up, royalty-free and worldwide." J.A. 613, § 2.1.

Google argues that Fortress acquired a license because the Unilocs committed an Event of Default by failing to achieve the specified patent-monetization revenues. While there appears to be no dispute that the revenue targets were not achieved, Uniloc 2017 disputes that this was an Event of Default because "Fortress did not regard Uniloc as in default." Appellant's Opening Br. 53.

On May 3, 2018, the Unilocs and Fortress entered into the Payoff and Termination Agreement ("Termination Agreement") to completely pay off all loan obligations arising from the RSA.  The Termination Agreement stated that "the Revenue Sharing Agreement . . . [and] the Patent License Agreement . . . shall terminate." J.A. 913, § 1(d)(i). On that same day, Uniloc 2017 acquired all relevant patents from Uniloc Lux.

In November and December of 2018, Uniloc 2017[2] filed several patent infringement suits in the Eastern District of Texas against Google, each alleging infringement of different patents in its patent portfolio.[3] Each asserted patent had been included in the License Agreement. In response, Google filed motions to dismiss for lack of standing and improper venue. The Eastern District of Texas agreed with Google that venue was improper, and the cases at issue were transferred to the Northern District of California. After transfer, the court ordered that Google file a single motion to dismiss that would govern the transferred cases. Google did so, and on December 22, 2020, the district court granted Google's motion and dismissed the Google cases for lack of subject matter jurisdiction.

The district court found that Uniloc 2017[4] committed at least one Event of Default sufficient to trigger Fortress's acquisition of the license. Having found that Fortress acquired the license, the district court concluded that Uniloc 2017 no longer had the right to exclude. Relying on cases involving exclusive licensees, as opposed to patent owners, the district court then concluded that a patent plaintiff must have exclusionary rights in the patent to have standing to sue for infringement and that a patent

---

[2] In many of the suits, Uniloc 2017 filed its complaint with Uniloc USA as a co-plaintiff. In each case where this occurred, Uniloc USA was later dismissed from the lawsuit.

[3] Uniloc 2017 originally filed twelve such cases. There are now only eleven before us because the twelfth case was closed in September 2020 in accordance with stipulations made by the parties.

[4] For simplicity, we hereinafter sometimes refer to both Uniloc 2017 and its predecessor entities as Uniloc 2017.

owner does not have such rights if another party can license the patent to the alleged infringer. It followed that Uniloc 2017 lacked standing.

The district court also found that the Termination Agreement did not eliminate Fortress's license because, under New York law, the fact that the license was "irrevocable" under the terms of the License Agreement unambiguously meant that the license survived termination because an "irrevocable" license is "not revocable for *any* reason." J.A. 15–19 (emphasis in original).

Uniloc 2017 appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1). We review a dismissal for lack of subject matter jurisdiction de novo. *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1311 (Fed. Cir. 2016).

## DISCUSSION

In light of our decisions today in the two related appeals, *Uniloc USA, Inc. v. Motorola Mobility LLC*, 21-1555 (Fed. Cir. 2022) and *Uniloc 2017 LLC v. Blackboard Inc.*, 21-1795 (Fed. Cir. 2022),[5] the sole issue here is whether the Termination Agreement eliminated any license Fortress had under the RSA and License Agreement. If the license was eliminated, the parties agree that Uniloc 2017 has standing in this case.

This dispute is one of contract interpretation. We review a district court's contract interpretation de novo. *Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.*, 477 F.3d 1361,

---

[5] In these two decisions, we hold that, as a matter of collateral estoppel from the earlier *Apple* case (*Uniloc USA, Inc. v. Apple Inc.*, No. C 18-00358 WHA, 2020 WL 7122617 (N.D. Cal. Dec. 4, 2020)), Fortress acquired a license to the asserted patents and this license deprived Uniloc 2017 of standing.

1364–65 (Fed. Cir. 2007). Both parties agree that New York contract law governs the interpretation of the termination issue. We therefore apply New York contract law.[6] *See Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1359 (Fed. Cir. 2005); *Plastronics Socket Partners, Ltd. v. Hwang*, 2022 WL 108948, at *2 (Fed. Cir. Jan. 12, 2022).

"A court's fundamental objective in interpreting a contract is to determine the parties' intent from the language employed and to fulfill their reasonable expectations." *Harmony Rockaway, LLC v. Gelwan*, 160 N.Y.S.3d 294, 296 (App. Div. 2021) (citing *Gilbane Bldg. Co./TDX Constr. Corp. v. St. Paul Fire & Marine Ins. Co.*, 97 N.E.3d 711, 712-13 (N.Y. 2018)). "[W]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Tomhannock, LLC v. Roustabout Res., LLC*, 128 N.E.3d 674, 675 (N.Y. 2019) (citation omitted). "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a

---

[6] The RSA contains a choice-of-law provision selecting New York state law; the Termination Agreement contains a choice-of-law provision selecting Delaware state law; and the License Agreement contains no specific choice-of-law provision. The district court seemed to conclude that the RSA's choice-of-law provision governed the License Agreement and that the key terms here appear in the License Agreement and not the Termination Agreement. Whether the parties are correct as to the application of New York law, we see no difference here between New York, Delaware, Federal Circuit, and general contract law principles.

difference of opinion." *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 170–71 (N.Y. 2002) (alteration in original) (citation and internal quotation marks omitted).

As in the companion cases decided today, we conclude that, as a matter of collateral estoppel, the License Agreement between the Unilocs and Fortress granted Fortress a "non-exclusive, transferrable, sub-licensable, divisible, irrevocable, fully paid-up, royalty-free and worldwide license" to a portfolio of the Uniloc patents, including those at issue in this case. J.A. 613, § 2.1. However, the Unilocs and Fortress terminated the License Agreement and RSA on May 3, 2018, by the Termination Agreement. The Termination Agreement stated that the RSA and License Agreement "shall terminate and shall be of no further force or effect without any further documentation or action and without liability to any party hereto, and the rights of each of the applicable parties under the applicable agreement shall terminate." J.A. 913, § 1(d)(i). The question is whether the license (including the right to sublicense) survived the Termination Agreement.

The language of the Termination Agreement is on its face sufficient to eliminate Fortress's license. Quite simply, the Termination Agreement states that the License Agreement and rights under that agreement "shall terminate." The entire purpose of the License Agreement was to grant and govern the grant of a license to Fortress. Therefore, by terminating the License Agreement and rights under that agreement, the Termination Agreement would appear to terminate Fortress's license.

The district court, in rejecting the conclusion that would seem to flow from the broad language of the Termination Agreement, held that, under New York law, the Termination Agreement did not terminate the license because the license was stated to be "irrevocable." J.A. 17–18. On its face the License Agreement describes the license as

"irrevocable." But this does not suggest the license is irrevocable by mutual agreement. The term "irrevocable" in its context clearly refers to the license's being "irrevocable" by the licensor.

Under the relevant case law, the term "irrevocable" does not suggest that the license could not be eliminated by mutual agreement. Cases construing the term "irrevocable" agree that the term means only that the irrevocable thing cannot be unilaterally revoked by the party that granted the benefit. *See In re Zimmerman (Cohen)*, 139 N.E. 764, 766 (N.Y. 1923) ("The word 'irrevocable,' here used, means that the contract to arbitrate cannot be revoked at the will of one party to it . . . . It does not mean that the agreement to arbitrate is irrevocable by the mutual agreement or consent of the parties."); *Silverstein v. United Cerebral Palsy Ass'n*, 232 N.Y.S.2d 968, 970-71 (App. Div. 1962) ("[L]ike any contract, the irrevocable offer may only be modified, released or rescinded by agreement of the parties. It cannot be unilaterally withdrawn, revoked or rescinded by the offeror." (citations omitted)); *Barclays Bank D.C.O. v. Mercantile Nat'l Bank*, 481 F.2d 1224, 1238 (5th Cir. 1973) (noting that the grantor of an irrevocable letter of credit "could not modify the irrevocable credit without [the grantee's] consent"); *In re Huntington*, ADV 11-4015, 2013 WL 6098405, at *8 (B.A.P. 9th Cir. Oct. 29, 2013) (noting that an irrevocable assignment cannot be revoked by one party, but can be revoked by mutual consent of all parties); *Carbonneau v. Lague, Inc.*, 352 A.2d 694, 696 (Vt. 1976) (concluding that an irrevocable license was terminated by a voluntary agreement between all parties).[7]

---

[7] The district court cited a Federal Circuit case where the patent owner sued the sublicensee for patent infringement, claiming that the exclusive license agreement

The cases cited by the district court are not to the contrary. They involved one party's unilateral attempt to revoke a license and, in each of those cases, the court simply found that, if a license is "irrevocable," the granting party cannot unilaterally take back the license. *See Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394, 400 (5th Cir. 2008) (applying New York law and concluding that, although termination is a usual remedy for breach of contract, the non-breaching party could not terminate the contract upon breach because the non-breaching party granted an irrevocable license, meaning a license that is "impossible to retract or revoke" and "committed beyond recall"); *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 357 (S.D.N.Y. 2020) (similar); *Cafferty v. Scotti Bros. Recs., Inc.*, 969 F. Supp. 193, 198 (S.D.N.Y. 1997) (similar); *In re Provider Meds, L.L.C.*, 907 F.3d 845, 856 (5th Cir. 2018) (applying New York law and explaining that an irrevocable license "may not be revoked for any reason [by the granting party], even a breach by the other side").

On appeal, Google concedes that "irrevocable" could not mean that the contracting parties were powerless to

---

it had with the sublicensor (the Master Agreement) was unilaterally terminated by the patent owner and thus the sublicensor's sublicenses were terminated. *See Fraunhofer-Gesellschaft zur Förderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.,* 940 F.3d 1372, 1378–82 (Fed. Cir. 2019). In the Master Agreement, the patent owner had granted the sublicensor an irrevocable license with the right to sublicense, but we held that, because of various provisions in the agreement, the Master Agreement was ambiguous as to whether the sublicensee's rights survived the termination of the Master Agreement. *Id.* at 1381. That case did not suggest that an "irrevocable" license could not be terminated by mutual agreement.

mutually terminate the license. Google now states: "Google does not argue . . . that Fortress and Uniloc [2017] were powerless to bilaterally rescind Fortress's sublicensing rights under the [License Agreement]." Appellee's Resp. Br. 34 (citation omitted). In short, the use of the word "irrevocable" does not prevent termination by mutual agreement.

However, Google relies on other language in the License Agreement (not relied on by the district court) to argue that Fortress's license survived. The License Agreement states that "[a]ny rights . . . which by their nature survive and continue after any expiration or termination of this Agreement will survive and continue and will bind the Parties . . . until such rights are extinguished." J.A. 614, § 6. Google argues that the Termination Agreement, despite its broad language, should not be read to undo the survival provisions of the License Agreement, and that Fortress's license is a right that would "by [its] nature" survive the termination of the License Agreement, in part because the agreement refers to the license as irrevocable.

In the Termination Agreement's section on mutual release, the Agreement does recognize that some provisions of the Released Agreements survive. *See* J.A. 915, § 2(b) ("[T]he forgoing release shall not apply to . . . any provision of any Released Agreement that survives the termination of such Released Agreement in accordance with its terms . . . ."). Further, cases support the proposition that where an original contract states that a provision will survive the termination of that contract, it is fair to assume that, absent explicit agreement, the provision will survive the original contract's termination. *See Dabney-Johnston Oil Corp. v. Walden*, 52 P.2d 237, 245 (Cal. 1935) (noting that a provision that applied to "any subsequent lease" survived after the termination of the existing lease contract); *Layne Christensen Co. v. Bro-Tech Corp.*, 836 F. Supp. 2d 1203, 1230 (D. Kan. 2011) (noting that a provision that

applied "during the [contract] Term and thereafter" survived termination because the parties plainly contracted for the provision to be applicable after the agreement ceased to be in force).  The Termination Agreement here is best construed not to eliminate "rights . . . which by their nature survive" termination.

However, the license here is not a right "which by [its] nature survive[s]" termination.  As we have discussed earlier, the use of the term "irrevocable" does not itself suggest the license survived a mutual agreement to terminate.  The phrase "rights . . . which by their nature survive" must refer to something in the nature of the right that makes it survive.  In other words, there must be something inherent in the right such that it survives.  Interpreting similar language in other agreements in the context of determining which rights survive contract expiration, courts have found that rights or contract provisions that by their nature survive termination include those related to what remedies are available in case of breach occurring during the term of the contract or dispute resolution mechanisms concerning such breach.  *See Litton Fin. Printing Div. v. N.L.R.B.*, 501 U.S. 190, 204 (1991) ("arbitration . . . of matters and disputes arising out of the relation governed by contract"); *Koch v. Compucredit Corp.*, 543 F.3d 460, 466 (8th Cir. 2008) (obligation to arbitrate "matters and disputes arising out of the relation governed by contract" (quoting *Litton Fin. Printing Div.*, 501 U.S. at 204)); *Webb Candy, Inc. v. Walmart Stores, Inc.*, No. 09-CV-2056, 2010 WL 2301461, at *7 (D. Minn. June 7, 2010) (forum selection clause); *Cottman Ave. PRP Grp. v. AMEC Foster Wheeler Env't Infrastructure Inc.*, 439 F. Supp. 3d 407, 436–37 (E.D. Pa. 2020) (an indemnification provision for "'any and all' claims, losses, damages, liability, costs or actions arising out of '*or resulting from*' Defendant's negligence '*in the performance*' of the work under the Contracts" (emphasis in original)); *see also Attain, LLC v. Workday, Inc.*, 2018 WL 2688299, at

*5 (E.D. Pa. June 4, 2018) (forum selection clause survived contract termination).

To be sure, it is possible that "rights . . . that by their nature survive" might also take account of instances of past usage of a license or reliance interests as to future uses created during the period of contract. For example, if Fortress had utilized the license in the past to produce products or had made future plans to produce a product utilizing the license, the license might be a right that by its nature survives even as to future product production (an issue we need not decide). However, there is no basis for believing that the plain meaning of "rights . . . which by their nature survive" encompasses a bare unexercised license.

Other contractual provisions in the License Agreement support this conclusion. The License Agreement provides that "[t]he Parties may terminate this Agreement at any time by mutual written agreement executed by both Parties provided that any sublicenses granted hereunder prior to the termination of this Agreement shall survive according to the respective terms and conditions of such sublicenses." J.A. 614, § 5.1. In recognizing the parties' authority to terminate the License Agreement by "mutual written agreement," this provision provides for the survival of only a very limited portion of Fortress's license right. This narrow exception for the survival of sublicenses granted prior to termination suggests that not all license rights would survive termination. *See In re N.Y.C. Asbestos Litig.*, 838 N.Y.S.2d 76, 80 (App. Div. 2007) ("[T]he [indemnification] provision's narrow exclusion for liability based upon Con Edison's sole active negligence must clearly be understood to mean that otherwise, where the liability is *not* the result of the *sole active negligence* of Con Edison, the indemnification provision remains applicable." (emphasis in original)).

Case 4:20-cv-05334-YGR   Document 358   Filed 11/04/22   Page 14 of 15

14                              UNILOC 2017 LLC v. GOOGLE LLC

Finally, Google argues that the license survives the Termination Agreement because the license can only be terminated by curing or annulling the Event of Default. According to the RSA, "[o]nce an Event of Default has occurred, such Event of Default shall be deemed to exist and be continuing for all purposes of this Agreement" until certain explicit cure or annulment criteria are met.[8]  J.A. 603–04, § 7.3.  Unlike the License Agreement, the RSA does not have a survival provision, and the quoted language does not suggest that Events of Default survive termination or that a license generated by an Event of Default would survive an agreement to terminate the license.  Nothing in the RSA prevented the Termination Agreement from eliminating a license generated by an Event of Default.

---

[8]  The RSA states:

Once an Event of Default has occurred, such Event of Default shall be deemed to exist and be continuing for all purposes of this Agreement until the earlier of (x) Majority Purchasers shall have waived such Event of Default in writing, (y) the Company shall have cured such Event of Default to the Majority Purchasers' reasonable satisfaction or the Company or such Event of Default otherwise ceases to exist, or (z) the Collateral Agent and the Purchasers or Majority Purchasers (as required by Section 9.4.1) have entered into an amendment to this Agreement which by its express terms cures such Event of Default, at which time such Event of Default shall no longer be deemed to exist or to have continued.

J.A. 603–04 § 7.3.

In sum, the only reasonable interpretation of "rights . . . which by their nature survive" is that those rights do not include a bare unexercised license. Because the license here did not survive termination, Fortress did not have the ability to sublicense the patents at issue when Uniloc 2017 brought suit against Google. Under these circumstances, Google agrees that Uniloc 2017 has standing. We therefore reverse the district court and remand this case for further proceedings consistent with this opinion.

**REVERSED AND REMANDED**